UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X   Case No.
JAMEL ZELLNER and PABLO SANCHEZ,

                                      Plaintiffs,                  **COMPLAINT**

                -against-                           **PLAINTIFFS DEMAND
                                                                            A TRIAL BY JURY**

USIS ELECTRIC, INC., DOMINIC WOHLTMAN, *Individually*,
JAMES BODRATO, *Individually,* and MICHAEL WEDLICK,
*Individually*,

                                      Defendants.
------------------------------------------------------------------X

      Plaintiffs, JAMEL ZELLNER and PABLO SANCHEZ, by their attorneys, PHILLIPS & ASSOCIATES, Attorneys at Law, PLLC, hereby complain of the Defendants, upon information and belief, as follows:

### NATURE OF THE CASE

1.    Plaintiffs complain pursuant to 42 U.S.C. §1981 and the New York City Human Rights Law, New York City Administrative Code §8-107, *et. seq.* ("NYCHRL"), and seek damages to redress the injuries Plaintiffs have suffered as a result of being **discriminated against** by their employer on the basis of their **Race (African American and Hispanic).** Additionally, Plaintiff ZELLNER suffered injuries as a result of being **discriminated against** on the basis of his **Sexual Orientation (gay)**. Both Plaintiffs were **retaliated against** by their employer solely for complaining of said discrimination.

### JURISDICTION AND VENUE

2.    Jurisdiction of this Court is proper under 42 U.S.C. §2000e-5(f)(3), and 28 U.S.C. §§1331 and 1343.

3. The Court has supplemental jurisdiction over the claims of Plaintiffs brought under state law pursuant to 28 U.S.C. §1367.

4. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §1391(b), as the acts complained of occurred therein.

## PARTIES

5. That at all times relevant hereto, Plaintiff JAMEL ZELLNER ("ZELLNER") was a resident of the State of New York and the County of Bronx.

6. That at all times relevant hereto, Plaintiff PABLO SANCHEZ ("SANCHEZ") was a resident of the State of New York and the County of Westchester.

7. That at all times relevant hereto, Defendant USIS ELECTRIC, INC. ("USIS") is a domestic business corporation duly existing under, and by virtue of, the laws of the State of New York, with its headquarters located at 35 West Jefferson Avenue, Pearl River, NY 10965.

8. That at all times relevant hereto, Plaintiff ZELLNER and Plaintiff SANCHEZ were employees of Defendant USIS.

9. That at all times relevant hereto, Defendant DOMINIC WOHLTMAN ("WOHLTMAN") was an employee of Defendant USIS, holding the position of "Project Manager/Estimator."

10. That at all times relevant hereto, Defendant WOHLTMAN was Plaintiff ZELLNER's and Plaintiff SANCHEZ's supervisor and had supervisory authority over Plaintiff ZELLNER and Plaintiff SANCHEZ.

11. That at all times relevant hereto, Defendant JAMES BODRATO ("BODRATO") was an

employee of Defendant USIS, holding the position of "Vice President, Electrical Division."

12. That at all times relevant hereto, Defendant BODRATO was Plaintiff ZELLNER's and Plaintiff SANCHEZ's supervisor and had supervisory authority over Plaintiff ZELLNER and Plaintiff SANCHEZ.

13. That at all times relevant hereto, Defendant MICHAEL WEDLICK ("WEDLICK") was an employee of Defendant USIS, holding the position of "Operations Director."

14. That at all times relevant hereto, Defendant WEDLICK was Plaintiff ZELLNER's and Plaintiff SANCHEZ's supervisor and had supervisory authority over Plaintiff ZELLNER and Plaintiff SANCHEZ.

15. That at all times relevant hereto, Defendant USIS, Defendant WOHLTMAN, Defendant BODRATO, and Defendant WEDLICK are collectively referred to herein as "Defendants."

## MATERIAL FACTS

16. On or about February 19, 2013, Plaintiff ZELLNER began working for Defendants as an "Apprentice Electrician," earning approximately $39,500 per year.

17. In or about November 2013, Plaintiff SANCHEZ began working for Defendants as a "Journeyman Electrician," earning approximately $62,400 per year.

18. During most of their tenure with Defendants, Plaintiffs ZELLNER and SANCHEZ were assigned by Defendants to various job sites throughout New York City, including the Waldorf Astoria, the Lexington hotel, Stuyvesant Town-Peter Cooper Village, NBC, WeWork, and various public schools.

19. At all times relevant hereto, Plaintiff ZELLNER and Plaintiff SANCHEZ were exemplary

3

employees, generally receiving praise for their work performance.

20. However, throughout Plaintiffs' employment, **<u>Defendants consistently and continuously discriminated against and harassed Plaintiff ZELLNER solely due to his Race (African American) and Sexual Orientation (gay), and discriminated against and harassed Plaintiff SANCHEZ solely due to his race (Hispanic)</u>**, creating an extremely hostile and intimidating work environment.

21. In addition, **<u>Defendants retaliated</u>** against Plaintiff ZELLNER and Plaintiff SANCHEZ solely for complaining of discrimination.

22. By way of example, in or about July 2013, Plaintiff ZELLNER reported to work wearing white utility boots. He was accosted by Defendant WOHLTMAN, who asked derisively, **"What Black guy wears white boots?"** Subsequently, this became a recurring theme among Plaintiff ZELLNER's co-workers, who often mocked Plaintiff ZELLNER for being an African American man who wore white boots.

23. On or about November 16, 2014, Matthew Brennan, who was Plaintiffs' foreman and had supervisory authority over Plaintiffs, sent a group text in which he posted a link to a YouTube rap video titled "Throw That Boy Pussy." The video depicts scantily clad young African American men dancing with each other in a sexually suggestive manner. In the accompanying text, Mr. Brennan asks: "Yo Pablo (Plaintiff SANCHEZ) did you shoot this video and is that Jamel (Defendant ZELLNER) in the back ground [*sic*] dancing." The video was sent to a number of Defendants' employees, including Plaintiffs' immediate supervisor, Defendant WOHLTMAN, and was obviously meant to humiliate Plaintiffs.

24. On the same day, on or about November 16, 2014, in a text thread that included

approximately fourteen (14) of Defendants' employees, including Defendant WOHLTMAN, **<u>Mr. Brennan posted a cartoon image of a monkey holding a trophy. The body of the text reads: "Pablo (Plaintiff SANCHEZ) your [*sic*] the best and a legend in your own mind. In honor of your master skills please accept this trophy!!!!"</u>** Plaintiff SANCHEZ was not only offended by being portrayed in this humiliating manner, he also felt deeply hurt to know that this was how many of his co-workers and supervisors evidently felt about him.

25. In or about the first week of December 2014, Plaintiff SANCHEZ complained to Mr. Brennan about the racist comments Plaintiff SANCHEZ and Plaintiff ZELLNER were being subjected to. Mr. Brennan was not only the source of many of those discriminatory comments, but as a foreman, he also was one of Plaintiff SANCHEZ's supervisors. Plaintiff SANCHEZ was aware that Defendants' policy dictated that complaints should be lodged with a supervisor. **<u>Unfortunately, Mr. Brennan's response to Plaintiff SANCHEZ's complaint was to laugh and walk away</u>**.

26. Not only did Mr. Brennan completely ignore Plaintiff SANCHEZ's complaint, he continued his discriminatory harassment. On or about December 25, 2014, Mr. Brennan posted the following comment in a group text which included Defendant WOHLTMAN. The text read: **<u>"HA HA Jamel (Plaintiff ZELLNER) keep making those great rap videos!! I hope you and your family enjoyed that holiday classic monkey meat for dinner, gotta get that recipe next time I see you. Merry Christmas."</u>**

27. On or about January 9, 2015, Nick Scalici, one of Plaintiffs' co-workers, sent out a group text which included a picture of two young African American men. One of the men is shown hugging the other and kissing his forehead. The text accompanying the picture

5

reads: "Jamel (Plaintiff ZELLNER) has a poster on the subway." This was obviously intended to ridicule Plaintiff ZELLNER because of his sexual orientation.

28. On or about January 16, 2015, an unidentified co-worker texted a group message to Plaintiff SANCHEZ and nine (9) other recipients, including Defendant WOHLTMAN. The message asks: "Which person wasn't a criminal?"

      A. Trevon [*sic*] Martin

      B. Mike Brown

      C. Erick Gardner [*sic*]

      D. None of the above

Trayvon Martin was a 17-year-old African American from Miami Gardens, Florida, who was unarmed when he was fatally shot by George Zimmerman, a neighborhood watch volunteer, in Sanford, Florida.

Michael Brown, an 18-year-old African American man, was also unarmed when he was fatally shot by Darren Wilson, a white, Ferguson, Missouri police officer. The disputed circumstances of the shooting and the resultant protests and civil unrest sparked a heated debate about law enforcement's relationship with African Americans, and police use of force doctrine in Missouri and nationwide.

Finally, On July 17, 2014, Eric Garner was unarmed when he died in Staten Island, New York, after Daniel Pantaleo, a white police officer put him in what has been described as a "chokehold" for about 15 to 19 seconds during an arrest. The New York City Medical Examiner's Office attributed Garner's death to a combination of a chokehold, compression of his chest, and poor health. New York City Police Department (NYPD) policy prohibits the use of chokeholds.

29. In the aforementioned text message, choice "D" is highlighted, implying that all three deceased African American men were criminals. **Deplorably, Defendant WOHLTMAN responded to this message not with condemnation but by gleefully exclaiming: "Hahahaha...damn, that shit came out of left field."**

30. In or about February 2015, Defendant WOHLTMAN sent a text message to Plaintiff ZELLNER, ostensibly to warn him about a blackout in his neighborhood. The message

6

included a link. When Plaintiff ZELLNER opened the link, what was displayed was an unidentified male individual exposing himself.

31. On or about April 8, 2015, while discussing Plaintiff ZELLNER, Nick Scalici tells Plaintiff SANCHEZ: **"I don't like niggers."**

32. On the same day, on or about April 8, 2015, Plaintiff ZELLNER sent an email to Defendant WOHLTMAN in which, among other things, he complained that he was being subjected to discrimination. As with the complaint Plaintiff SANCHEZ lodged with Mr. Brennan in or about December 2014, Plaintiff ZELLNER was following Defendants' protocol by complaining to his supervisor. **Alarmingly, Defendant WOHLTMAN responded by asserting: "First off, relax with the discrimination nonsense."**

33. Several days later, on or about April 13, 2015, Plaintiff ZELLNER ran into Defendant WOHLTMAN and again voiced his complaints of discrimination. This time, Defendant WOHLTMAN said that he would look into said complaints. However, no action was taken to address the discrimination Plaintiffs were constantly subjected to. **Shortly thereafter, and clearly in retaliation for voicing his complaints, Plaintiff ZELLNER's pay was reduced from $22/hour to $16/hour.**

34. In or about May 2015, Plaintiff SANCHEZ and Plaintiff ZELLNER were on their way to lunch when they were approached by Mr. Brennan and a number of their co-workers. In a mocking and derisive tone, Mr. Brennan asked Plaintiffs: **"Where are you guys going for lunch? The watermelon stand, or are you going out for fried chicken and grape soda?"**

35. On or about May 19, 2015, at the end of their workday, Plaintiffs were viewing a video on Plaintiff ZELLNER's cell phone. The video showed kids playing with Roman candle

7

fireworks. Mr. Brennan approached Plaintiffs and asked: "Where is this video from, your neighborhood?" Plaintiff SANCHEZ asked: "No, why would it be in my neighborhood?" Mr. Brennan replied: **"Only in the 'hood' you see people doing stupid shit like this."**

36. On or about May 22, 2015, Plaintiff SANCHEZ and Plaintiff ZELLNER came to an agreement that complaining to Defendant WOHLTMAN and Mr. Brennan had produced no positive results. They therefore decided to contact Defendant WEDLICK, Defendants' Operations Director. With Plaintiff SANCHEZ's consent to speak on his behalf, Plaintiff ZELLNER emailed Defendant WEDLICK, informing him of the discrimination to which Plaintiffs had been constantly subjected. Defendant WEDLICK promised to look into the matter, but nothing was ever done.

37. On or about June 14, 2015, several of Defendants' employees, including Defendant WOHLTMAN, Stephen Wohltman who, upon information and belief, is Defendant WOHLTMAN's brother, and Nick Scalici used a text message thread to insult and humiliate Plaintiff ZELLNER because he creates satirical rap videos. The following comments all refer to Plaintiff ZELLNER: **"I think he chased a crack pipe dream and caught it." "The white version would be 'let's have a baby, eventually buy a house and have good credit'." "I think from here on out though when he speaks he should rap, you understand him better." "LMAO, this post blew up like welfare."**

38. Increasingly desperate as a result of the unremitting discriminatory harassment, Plaintiff SANCHEZ sought to transfer out of the Electrical Division. On or about June 26, 2015, Mike Nagle, a project manager who had worked with Plaintiff SANCHEZ on a WeWork project, recommended Plaintiff SANCHEZ to Michael Engblom, the head of Defendants' Security Division. Later that same day, on or about June 26, 2015, Michael Engblom sent

8

Plaintiff SANCHEZ an email in which he said, in part: "Glad to hear your interest in the security team. **I have reached out to Jimmy Bodrato (Defendant BODRATO) who is my counterpart in the electrical group to begin the process of transfer.**"

39. Had Plaintiff SANCHEZ been allowed to transfer, he would have escaped the hostile work environment of the Electrical Division and attained better opportunities for career advancement and salary increases. Unfortunately, still later that same day, on or about June 26, 2015, after having been contacted by Michael Engblom, Defendant BODRATO called Plaintiff SANCHEZ and irately demanded to know why he wanted a transfer. Plaintiff SANCHEZ attempted to explain his reasons, which included his desire to escape the discriminatory harassment he had been subjected to, but Defendant BODRATO became even more enraged, saying, **"you got a set of balls,"** accusing Plaintiff SANCHEZ of being **"a ball of fire,"** and telling him he had **"some fucking nerve to complain about my (Defendant BODRATO's) division."** Defendant BODRATO also threatened Plaintiff SANCHEZ, saying: **"You'd better watch your ass,"** and telling Plaintiff that he didn't know if Plaintiff would have a position with Defendant USIS much longer.

40. **Defendant BODRATO intentionally prevented Plaintiff SANCHEZ's transfer as a clear act of retaliation for Plaintiff SANCHEZ's complaints of discrimination.**

41. **On or about July 8, 2015, approximately six (6) weeks after having promised to investigate Plaintiff ZELLNER's complaints of discrimination, Defendant WEDLICK terminated Plaintiff ZELLNER's employment, purportedly for talking on his cell phone.** Defendants' reason for the termination of Plaintiff ZELLNER's employment was clearly **pretextual**, as Plaintiff ZELLNER had never been warned that

9

cell phone use was prohibited, nor had cell phone use ever been an issue in the past. Moreover, upon information and belief, Defendants regularly permitted other employees, who did not complain of discrimination, to use their cell phones during work hours.

42. **Thus, based on the close temporal proximity to his complaints of discrimination, it is clear that Defendants terminated Plaintiff ZELLNER's employment solely in retaliation for complaining of discrimination.**

43. On or about July 16, 2015, Plaintiff SANCHEZ sent an email to Defendant WOHLTMAN in which, among other things, he complained of having been subjected to discrimination due to his race. Later that same day, on or about July 16, 2015, Defendant WOHLTMAN replied to Plaintiff SANCHEZ and attempted to deflect Plaintiff's complaints of discrimination by accusing Plaintiff SANCHEZ of poor job performance. It should be noted that, contrary to Defendant WOHLMAN's assertion, Plaintiff SANCHEZ's job performance had been deemed excellent by his superiors until he complained of discrimination and attempted to transfer out of Defendants' Electrical Division. Subsequent to his attempt to transfer to the Security Division, Plaintiff SANCHEZ suddenly, and suspiciously, began to get complaints about his job performance from Defendants BODRATO and WOHLTMAN. However, Plaintiff has not been written up or received even a verbal warning. Toward the end of his email, Defendant WOHLTMAN does address the issue of discrimination, but he does so by making the following self-serving declaration: "As to your allegation regarding discrimination on my part, the past makes it clear that you have not been discriminated against."

44. Upon information and belief, on or about July 29, 2015, Defendants were notified that

10

Plaintiff ZELLNER and Plaintiff SANCHEZ had retained counsel with respect to the claims put forth in the instant Complaint. **This led to a marked increase in the retaliation Plaintiff SANCHEZ was subjected to by Defendants.**

45. By way of example, in or about the second week of August 2015, Plaintiff SANCHEZ was assigned by Defendants to a job site with hazardous working conditions. When Plaintiff contacted his foreman regarding said conditions, the foreman advised Plaintiff to be careful because Defendants had Plaintiff "under a microscope." The foreman went on to say that he had been instructed by Defendants to "keep an eye" on Plaintiff and report to Defendants on a daily basis regarding Plaintiff's behavior and job performance. The foreman added that Plaintiff should "watch his back" because Defendants "have it out for (Plaintiff)."

46. On or about August 14, 2015, Plaintiff SANCHEZ left work early, as instructed by the foreman at the job site, because the tasks assigned for that day had been completed. The foreman and all of Plaintiff's co-workers who were assigned to that job site also left at the same time. However, Plaintiff SANCHEZ was the only one who was subsequently reprimanded for leaving early.

47. On or about September 21, 2015, Plaintiff SANCHEZ was informed by co-workers who opposed the discriminatory treatment Plaintiff had been subjected to that Defendants' attorneys and Mary Davidson, the head of Defendants' Human Resources Department, had instructed several of Defendants' employees to monitor Plaintiff and report his slightest infractions.

48. On or about September 22, 2015, a co-worker informed Plaintiff SANCHEZ that he had been instructed by Defendants to find ways to "break (Plaintiff's) balls." The co-worker

stated to Plaintiff that he had no intention of doing as he had been asked because he felt Plaintiff had been "victimized too much."

49. On or about September 12, 2015, a general foreman stated to Plaintiff SANCHEZ that he had been approached by Defendants and pressured to provide anything that could be used against Plaintiff. The general foreman stated to Plaintiff that he advised Defendants that "He (Plaintiff SANCHEZ) does what he has to do and I do what I have to do. All I know is that he's here and he's working. He does what he has to do and I do what I have to do."

50. On or about October 1, 2015, in a final act of retaliation, Plaintiff SANCHEZ's employment was terminated. The termination letter Plaintiff received stated, rather predictably, that Defendants had "received reports from various supervisors to whom you (Plaintiff SANCHEZ) were assigned that there were substantial issues with your performance…" **This accusation was clearly pretextual because, as mentioned supra, Plaintiff's job performance had been deemed excellent by his superiors until he began to complain of discrimination.**

51. The above are just some of the acts of harassment, discrimination and retaliation that Plaintiff ZELLNER and Plaintiff SANCHEZ experienced on a regular and continual basis while employed by Defendants.

52. Plaintiff ZELLNER and Plaintiff SANCHEZ were not only offended, disturbed, and humiliated by the blatantly unlawful discrimination and retaliation, they also had good reason to fear for their physical safety. Electricians work under dangerous conditions, dealing with extremely high voltages and other hazards. Therefore, they must be able to rely on one another. Plaintiff ZELLNER and Plaintiff SANCHEZ found it very difficult

to entrust their lives to co-workers who seemed to hate them solely because of their Race and Plaintiff ZELLNER's sexual orientation.

53. Plaintiff ZELLNER and Plaintiff SANCHEZ were regularly exposed to a hostile work environment due to their race and to Plaintiff ZELLNER's sexual orientation.

54. But for the fact that Plaintiff SANCHEZ is Hispanic and Plaintiff ZELLNER is African American and gay, Defendants would not have treated them differently.

55. **But for the fact that Plaintiff ZELLNER and Plaintiff SANCHEZ objected to, and complained about, Defendants' harassment and discrimination, Defendants would not have retaliated against them.**

56. Unfortunately, upon information and belief, no appropriate or reasonable action was ever taken regarding Defendants' blatant discrimination and retaliation against Plaintiff ZELLNER and Plaintiff SANCHEZ.

57. Defendants' actions and conduct were intentional and intended to harm Plaintiff ZELLNER and Plaintiff SANCHEZ.

58. Plaintiff ZELLNER and Plaintiff SANCHEZ have been unlawfully discriminated against, retaliated against, humiliated, degraded and belittled, and as a result, suffer loss of rights, emotional distress, and physical injury.

59. Plaintiff ZELLNER's and Plaintiff SANCHEZ's performance was, upon information and belief, above average during the course of their employment with Defendants.

60. As a result of Defendants' actions, Plaintiff ZELLNER and Plaintiff SANCHEZ feel extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

61. As a result of the Defendants' discriminatory and retaliatory treatment of Plaintiff ZELLNER and Plaintiff SANCHEZ, they have suffered severe emotional distress and

physical ailments.

62. As a result of the acts and conduct complained of herein, Plaintiff ZELLNER and Plaintiff SANCHEZ have suffered emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

63. As a result of the above, Plaintiff ZELLNER and Plaintiff SANCHEZ have been damaged in an amount which exceeds the jurisdictional limits of the Court.

64. Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law. As such, Plaintiff ZELLNER and Plaintiff SANCHEZ demand Punitive Damages as against all Defendants, jointly and severally.

## AS A FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER 42 U.S.C. §1981

65. Plaintiffs repeat and reallege each and every paragraph above as if said paragraph was more fully set forth herein at length.

66. 42 U.S.C. § 1981 states in relevant part as follows:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. §1981.

67. Plaintiffs were discriminated against because of their race as provided under 42 U.S.C. §1981 and have suffered damages as set forth herein.

## AS A SECOND CAUSE OF ACTION
## <u>FOR RETALIATION UNDER 42 U.S.C. §1981</u>

68. Plaintiffs repeat and reallege each and every paragraph above as if said paragraph was more fully set forth herein at length.

69. By the acts and practices described above, Defendants retaliated against Plaintiffs for their opposition to unlawful discrimination under 42 U.S.C. §1981.

70. Defendants acted with malice and/or reckless indifference to Plaintiffs' statutorily protected rights.

71. As a result of Defendants' discriminatory acts, Plaintiffs have suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## AS A THIRD CAUSE OF ACTION FOR DISCRIMINATION
## <u>UNDER THE NEW YORK CITY ADMINISTRATIVE CODE</u>

72. Plaintiffs repeat, reiterate and reallege each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

73. The New York City Administrative Code §8-107(1) provides that "It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, **race**, creed, color, national origin, gender, disability, marital status, **sexual orientation** or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

74. Defendants engaged in an unlawful discriminatory practice in violation of New York City

Administrative Code §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against both Plaintiffs because of their race, and Plaintiff ZELLNER because of his sexual orientation.

### AS A FOURTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

75. Plaintiffs repeat, reiterate and reallege each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

76. The New York City Administrative Code §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

77. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

### AS A FIFTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

78. Plaintiffs repeat, reiterate and reallege each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

79. The New York City Administrative Code §8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discriminate against any person because such person has opposed any practices forbidden under this chapter. . ."

80. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code §8-107(7) by discriminating against Plaintiffs because of Plaintiffs' opposition to the unlawful employment practices of Plaintiffs' employer.

## AS AN SIXTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

81. Plaintiffs repeat, reiterate and reallege each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

82. The New York City Administrative Code §8-107(13) Employer liability for discriminatory conduct by employee, agent or independent contractor.

   a. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.

   b. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

   1. the employee or agent exercised managerial or supervisory responsibility; or

   2. the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

   3. the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

17

  c. An employer shall be liable for an unlawful discriminatory practice committed by a person employed as an independent contractor, other than an agent of such employer, to carry out work in furtherance of the employer's business enterprise only where such discriminatory conduct was committed in the course of such employment and the employer had actual knowledge of and acquiesced in such conduct.

83. Defendants violated the section cited herein as set forth.

## JURY DEMAND

84. Plaintiffs request a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiffs respectfully request a judgment against Defendants:

 A. Declaring that Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §1981, and the New York City Administrative Code §8-107 *et. seq.*, in that Defendants discriminated against Plaintiffs ZELLNER and SANCHEZ on the basis of their race. Additionally, Defendants discriminated against Plaintiff ZELLNER on the basis of his sexual orientation. Defendants also retaliated against Plaintiffs for complaining of discrimination;

 B. Awarding Plaintiffs compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to their reputation in an amount to be proven;

 C. Awarding Plaintiffs punitive damages;

 D. Awarding Plaintiffs attorneys' fees, costs, and expenses incurred in the prosecution of

the action; and

E.   Awarding Plaintiffs such other and further relief as the Court may deem equitable, just and proper to remedy Defendants' unlawful employment practices.

Dated: New York, New York
       October 20, 2015

PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC

By: _/s/ Alex Umansky_

Alex Umansky (AU7961)
*Attorneys for Plaintiff*
45 Broadway, Suite 620
New York, New York 10006
(212) 248-7431
aumansky@tpglaws.com
